# UNITED STATES DISTRICT COURT
для the
Western District of North Carolina

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>**THE PERSON OF MARCUS EDWARD PINSON III FOR BUCCAL SWABS AND PRINTS** | Case No. 3:22-mj-00165 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the __Western__ District of __North Carolina__, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☒ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 26 U.S.C. §§ 5861(d) and (f) | Possession of a Firearm Not Registered in the National Firearms Registration and Transfer Record and Making a Firearm in Violation of Title 26 United States Code |

The application is based on these facts:

See accompanying Affidavit.

- ☒ Continued on the attached sheet.
- ☐ Delayed notice _____ days (give exact ending date if more than 30 _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/ Theresa Wellens
*Applicant's signature*

Theresa Wellens, Special Agent, FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P 4.1 by telephone.

Signed: April 4, 2022

Date: 4/4/2022

City and state: Asheville, North Carolina

W. Carleton Metcalf, United States Magistrate Judge, WDNC
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: THE PERSON OF MARCUS EDWARD PINSON III FOR BUCCAL SWABS AND PRINTS | Case No. 3:22-mj-00165 |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE**

I, Theresa Wellens**,** being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this Affidavit in support of an Application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the person of **Marcus Edward PINSON III** (**PINSON**)**,** date of birth: 09/05/1992, social security number XXX-XX-0223, for the purpose of obtaining deoxyribonucleic acid (DNA) and major case prints by collecting oral (buccal) swab samples and fingerprints (to include palm prints) according to the standard practices and procedures employed by the FBI for DNA and fingerprint testing and comparison. Based on the facts set forth in this Affidavit, there is probable cause to believe that **PINSON** violated federal criminal statutes, including but not limited to the following crime: *Receiving and possessing a firearm not registered to him in the National Firearms Registration and Transfer Record and making a firearm in violation of Title 26 of the United States Code*, in violation of Title 26, United States Code, sections 5861(d) and (f) and that **PINSON**'s DNA and fingerprints will provide evidence of such crimes.

1

2. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been since 2017. I am a federal law enforcement officer within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant and make arrests. I am presently assigned to the Charlotte Field Office Joint Terrorism Task Force ("the Terrorism Task Force"), which seeks to combat terrorism, as well as other dangerous terrorist activity, to include but not limited to narcotics trafficking, weapons possessions and trafficking, and money laundering in the Charlotte area and beyond. Prior to my current assignment, I was assigned to the Oklahoma Division-Tulsa Resident Agency on a temporary duty (TDY) status. While on TDY, I was investigating criminal violations occurring within the federal jurisdiction of Indian country as defined by Title 18 U.S.C. § 1151 and 1153. Additionally, prior to current assignment, I was on the Charlotte Field Safe Streets Task Force ("the Safe Streets Task Force"), which seeks to combat gang-related violence to include murder and assault, as well as other dangerous gang activity, such as narcotics trafficking, weapons possessions and trafficking, and money laundering in the Charlotte area and beyond. Each Task Force I have been a member of is comprised of law enforcement agents and officers from federal, state and local agencies and police departments; and coordinates it activities nationally, working closely with other Terrorism and Safe Streets Units investigating the same terrorists and gangs as well as the activity of each in their respective areas. During my participation with these investigations, I have conducted multiple searches of the following but not limited to multiple electronic devices, premises, social media, and gathered evidence, to include electronic evidence, pursuant to respective search warrants. I have assisted in multiple Title Ill investigations involving the interception of wire and electronic communications of the members and associates of the Nuestra Familia and Nortenos Hispanic

Street Gangs. Both these cases involved narcotics trafficking, firearms trafficking, and Violent Crime In Aid of Racketeering (VICAR). I assisted in the Racketeering investigation (RICO) of members of the United Blood Nation. I have investigated gang-related crimes, including but not limited to, narcotics trafficking, murder, assault, weapons possession and trafficking, fraud, interstate transportation of stolen property, the investigation of organized criminal activities and the laundering of monetary instruments associated with these crimes. Through the course of my investigations, I have also conducted numerous interviews pertaining to drug trafficking, terrorism, violent crime, and gang activity. Throughout my career with the FBI, I have investigated numerous violations of federal law, to include federal violations concerning domestic terrorism. Additionally, I have gained experience through training, classes, and case work conducting these types of investigations. Further, as a Federal Agent, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

3. Based upon my training, experience and investigations, I know that individuals engaging in criminal activity will, when interacting with law enforcement, distance themselves from their criminal activity, to include denying ownership of contraband, weapons, and/or electronic devices found on their person, within a vehicle and/or within a residence. Based on my experience, it is not uncommon for individuals engaging in criminal activity to have multiple firearms that are not registered to them or have any information at all. I know from my training, experience, and investigations, that individuals engaging in criminal activity will also lie to law enforcement about their identities and their affiliations to mask their criminal activity.

4. This Affidavit is intended to show only that there is sufficient probable cause for the requested Warrant and does not set forth all my knowledge about this matter. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not

3

included every fact known to me concerning this investigation. I have set forth facts that I believe are sufficient to establish probable cause to obtain the requested warrant.

## PROBABLE CAUSE

5. Based on Your Affiant's training and experience and the facts as set forth in this Affidavit, there is probable cause to believe that **MARCUS EDWARD PINSON III (DOB 09/05/1992)** has committed the following crimes: *Receiving and possessing a firearm not registered to him in the National Firearms Registration and Transfer Record and making a firearm in violation of Title 26 of the United States Code*, in violation of Title 26, United States Code, sections 5861(d) and (f).

  a. Receiving and possessing a firearm[1] not registered to him in the National Firearms Registration and Transfer Record is a federal crime, as set forth in Title 26 U.S.C. 5861(d):

  > It shall be unlawful for any person to receive or possess a firearm, which is not registered to him in the National Firearms Registration and Transfer Record.

  b. Making a firearm is in violation of Title 26 United States Code, Title 26 U.S.C. 5861(f):

  > It shall be unlawful for any person to make a firearm in violation of the provisions of this chapter.

## SUMMARY OF THE OFFENSE

---

[1] The definition of a "firearm" for purposes of 26 U.S.C. §§ 5861(d) and (f) is found at 26 U.S.C. § 5845(a), and includes a "destructive device." 26 U.S.C. § 5845(a)(8). A "destructive device" is further defined in 26 U.S.C. § 5845(f). "The term 'destructive device' means (1) any explosive, incendiary, or poison gas (A) bomb . . . or (F) similar device . . ." 26 U.S.C. § 5845(f)(1).

6. At all times relevant to this Affidavit, your Affiant believes beginning approximately seven months prior to January 2022, **PINSON** engaged in the receipt, possession and making of explosive and incendiary devices. **PINSON** received and possessed explosive and incendiary devices not registered to him in the National Firearms Registration and Transfer Record. On January 19, 2022, the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) checked the National Firearms Registration and Transfer Record and determined **PINSON** does not have any firearms registered.[2] Moreover, ATF queried their databases on **PINSON** and confirmed on January 19, 2022 that **PINSON** does not have the required license, the Federal Explosives License (FEL), and is not registered to manufacture explosive devices. Additionally, queries were conducted on all individuals mentioned herein, and each were confirmed not to have an FEL to manufacture explosive devices.

7. According to Michael Truman Simmons (SIMMONS), he and **PINSON** were roommates and began living together in early 2020. On or about mid-2020, both moved into an apartment known to the Affiant in Charlotte, NC. **PINSON** and his girlfriend occupied the upstairs front bedroom and SIMMONS resided in the upstairs back bedroom.

8. On or about June 2021, **PINSON** asked SIMMONS to purchase chemicals[5] on-line for him. **PINSON** had asked him to purchase the chemicals because, as **PINSON** stated, he knew that ordering a "certain amount would get him on the FBI list."

9. On or about August 2021, SIMMONS stated that he came home from work and **PINSON** wanted to show SIMMONS something. **PINSON** had a disc-like device that he ignited in the yard behind their shared apartment. The device emitted a smoke cloud and was described

---

[2] The definition of "Firearms" includes "destructive devices." 26 U.S.C. § 5845(a)(8).
[5] Simmons told the FBI he purchased capsicum for **PINSON.** Capsicum is the active ingredient in pepper spray. It is not clear whether capsicum was the chemical Simmons was asked to purchase for **PINSON** in June 2021.

5

by **PINSON** as a "poor man's tear gas grenade" and that it could cause chemical burns if someone were exposed to the fumes.

10. Following the detonation of the device, **PINSON** stated to SIMMONS that it would be beneficial to have a device such as the one they detonated in situations such as riots and/or protests. SIMMONS clarified that **PINSON** stated that he wanted to detonate the device in a protest crowd. SIMMONS also stated that **PINSON** had made additional comments about harming individuals such as, "wouldn't it be nice if we could just poison all the homeless" and "it needs to be legal to slot Commies." SIMMONS further clarified that "slotting" meant to put a bullet in the head of an individual.

11. **PINSON** and SIMMONS discussed at length the Kyle Rittenhouse trial and the potential for riots in the aftermath of the trial's verdict. November 19, 2021 was the date the jury in Wisconsin handed down the verdict in the Kyle Rittenhouse trial. SIMMONS used this date as a point of reference when discussing **PINSON's** activities. Major media outlets extensively covered the Rittenhouse case during 2021 in the months leading up to the verdict in that case.[6]

12. On or about January 8, 2022, Charlotte-Mecklenburg Police Department (CMPD) officers were contacted by SIMMONS, who had concerns about **PINSON's** activities. SIMMONS advised Detectives that he believed his roommate, **PINSON**, may be creating chemical bombs and had seen **PINSON** reading the *Anarchist Cookbook*[7].

13. On or about January 9, 2022, CMPD responded to an accidental shooting at **PINSON**'s apartment in Charlotte, NC. Officers responded and initiated their body worn cameras

---

[6] https://www.npr.org/2021/11/19/1057288807/kyle-rittenhouse-acquitted-all-charges-verdict
[7] The Anarchist Cookbook, first published in 1971, is a book containing instructions for the manufacture of explosives, rudimentary telecommunications phreaking devices, and related weapons, as well as instructions for the home manufacture of illicit drugs.

(BWCs). As CMPD officers were responding, the victim, **PINSON**, was in the back of a Medic transport vehicle and leaving for the hospital. The suspected shooter, Steven Durant (DURANT), stated that he had been "field stripping" an AR-style rifle[8] and it went off. DURANT stated that the rifle was on his cot in the living room inside the apartment. DURANT gave the officers consent to enter the residence. As officers entered, they noted on the main floor a workshop looking area with several storage shelves along the wall. Officers observed several different rifles, pistol magazines on a table, tactical gear within the apartment as well as the AR-style rifle placed on a cot.[9] Additionally, officers observed a small hole in the ceiling near the cot and rifle. **PINSON's** fiancée, Amber JAMES, stated that she and **PINSON** were lying upstairs in their bedroom on their bed when she heard a pop and **PINSON** was shot in the back.

14. On or about January 10, 2022, CMPD Detectives contacted the Federal Bureau of Investigation (FBI) and advised of the information they had received from SIMMONS on or about January 8, 2022.

15. On January 14, 2022, an FBI TFO conducted a telephone interview of SIMMONS. As outlined in paragraph 8, SIMMONS stated that approximately seven (7) months prior to the current interview **PINSON** asked SIMMONS to purchase some unknown chemicals online. **PINSON** told SIMMONS that if a certain amount of those chemicals were ordered they would be on an FBI watch list. As outlined in paragraph 9, SIMMONS advised he came home from work approximately five (5) months prior and **PINSON** asked him if he wanted to see something cool. SIMMONS said **PINSON** had a disc-looking device that **PINSON** ignited in the backyard of their apartment and emitted a smoke cloud. SIMMONS informed the FBI **PINSON** had

---

[8] The AR rifle that was accidentally discharged was owned by Simmons.
[9] No explosives were observed.

7

ordered books on-line regarding making homemade explosives. SIMMONS told the FBI he had pictures of the device **PINSON** made. SIMMONS agreed to meet and speak further with the FBI and to bring the pictures of the device **PINSON** made and ignited.

16. On or about January 19, 2022, FBI Task Force Officers (TFOs) interviewed SIMMONS at the FBI Charlotte Field Office guard shack. SIMMONS stated to the TFOs that his roommate, **PINSON**, had made an explosive device and was possibly intending on using it in public.

17. SIMMONS brought to the interview an incendiary device he advised that **PINSON** had made months prior. FBI Special Agent Bomb Technician (SABT) assessed that the device was potassium perchlorate[10] and an incendiary device[11].

18. SIMMONS advised the interviewers that he was with **PINSON** as **PINSON** manufactured more incendiary devices. SIMMONS noted that **PINSON** already had the chemical compound mixed. SIMMONS did not know where or how **PINSON** acquired the chemicals for the device. SIMMONS witnessed **PINSON** assemble the device in the following manner: 1) drilling the hole in the lid of the device; 2) inserting the chemical compound; 3) inserting the fuse; 4) wrap the fuse with masking tape to a striker strip; 5) put a match to the fuse; 6) enclose the entire device with aluminum tape; 7) and held together with a rubber band.

19. SIMMONS showed interviewers the pictures of the books **PINSON** had purchased online previously. Several of the titles include, but are not limited to, the following: *The USA

---

[10] Potassium perchlorate appears as a white crystalline solid. It forms explosive mixtures with certain combustible materials. It is difficult to burn but will accelerate burning of combustible materials. Prolonged exposure to fire or heat may result in an explosion. The substance is used in explosives, pyrotechnics, photography. Source: pubchem.ncbi.nlm.nih.gov

[11] "Explosives" means any chemical compound mixture, or device, the primary or common purpose of which is to function by explosion; the term includes, but is not limited to, dynamite and other high explosives, black powder, pellet powder, initiating explosives, detonators, safety fuses, squibs, detonating cord, igniter cord, and igniters. *See* 18 U.S.C. Section 841(d) (The definition of "explosive" under Title 18 is instructive in defining the term "explosive" under 26 U.S.C. § 5845(f)(1)).

*Army Improvised Munitions Handbook; USA Survival Series: Camouflage Moving in Combat; US Army Recon and Survival Handbook; US Army Guide to Booby Traps; The US Army Guerrilla Handbook; The US Army Explosives and Demo Handbook; Anarchist Cookbook; The Advanced Anarchist Arsenal; and The Device and Tech to Incendiary Devices.*[12] In my training and experience, I know these books to be used by individuals planning and preparing to commit violence.

20. SIMMONS advised interviewers that **PINSON** had researched and purchased these books on his cellular telephone. I know in my training and experience individuals planning to conduct violence with destructive devices will research and download materials found online such as guides and/or manuals to aid in the construction and facilitation of an explosive incendiary or destructive device. Such individuals will utilize all mediums of electronic devices for such research and planning to include, but not limited to, cellular phones, laptop computers, desktop computers, and/or tablets.

21. Additionally, SIMMONS advised interviewers that several more incendiary devices made by **PINSON** were located within the apartment they shared in Charlotte, NC. SIMMONS outlined for interviewers the locations of each device. SIMMONS believed there to be approximately nine (9) to ten (10) additional incendiary devices within the apartment. SIMMONS provided consent to the TFO to search the residence shared by himself, **PINSON**, and two others. SIMMONS signed a written consent form giving police consent to search the premises of the apartment.

---

[12] Simmons advised he thought **PINSON** was mentally stable and probably ordered the books because **PINSON** would rather have knowledge in case if things went bad (in relationship to the 2nd amendment laws and the government losing control).

9

22. On or about January 19, 2022, the CMPD bomb squad performed an exigent search of the premises of **PINSON**'s apartment in Charlotte, NC 28210 for public safety and seized the following: seven (7) identical devices to the device that was brought to the FBI Charlotte guard shack by SIMMONS on January 19, 2022.[13] Additionally, CMPD bomb squad observed on the premises of the apartment approximately seven (7) firearms, two pounds of Tannerite[14] and various chemicals. CMPD bomb squad conducted a field test on chemicals found at **PINSON's** apartment and the chemicals reacted consistent with chemicals used in making incendiary devices. After seizing the seven (7) suspected incendiary devices, CMPD sealed the apartment and posted police officers at the residence to secure the scene until a search warrant to search the apartment was obtained.[15]

23. On January 20, 2022, FBI Charlotte executed a search warrant issued by the Western District of North Carolina for **PINSON**'s apartment. Materials consistent with the devices SIMMONS described to interviewers on January 19, 2022, which **PINSON** utilized to build incendiary devices, were located throughout the apartment. This includes but is not limited to the following items: masking tape, rubber bands, aluminum tape, the metal device container, matchsticks, various fuse cord and various chemicals. FBI SABT further confirmed items were consistent with the device that was brought to the FBI Charlotte Field Office on January 19, 2022 and were consistent with the seven (7) additional devices seized from **PINSON's** residence on January 19, 2022 by FBI SABT and CMPD Bomb Squad.

24. Additionally, the books described above in

---

[13] Simmons provided police with the key to the apartment to allow CMPD to open the door.
[14] Tannerite is a name brand of binary explosive. Binary explosives are pre-packaged products consisting of two separate components, usually an oxidizer like ammonium nitrate and a fuel such as aluminum or another metal. https://www.atf.gov/explosives/binary-explosives

paragraph 19, such as the *Anarchist Cookbook*, were also observed in the in the room known to be used by **PINSON.**

25. Based on my training and experience, I am aware that individuals that handle the aforementioned items identified by the FBI SABT as items consistent with the constructed explosive devices described in detail previously may leave their DNA and/or fingerprints on such devices and associated parts. All items seized in relation to this investigation have been maintained by law enforcement pending DNA and fingerprint comparison, which is the subject of this warrant application.

## **CONCLUSION**

26. Based on my training, experience, and the facts set forth in this Affidavit, there is probable cause to believe that **PINSON** violated federal criminal statutes, including but not limited to the following crime: *Receiving and possessing a firearm not registered to him in the National Firearms Registration and Transfer Record and making a firearm in violation of Title 26 of the United States Code*, in violation of Title 26, United States Code, sections 5861(d) and (f) and that evidence of such violations will be found on the person of **Marcus Edward PINSON III**, date of birth: 09/05/1992, social security number XXX-XX-0223, in the form of DNA and fingerprints. Said DNA and fingerprints are relevant and material in the context of forensic evaluation with regard to establishing **PINSON**'s possession or handling of materials consistent with constructing explosive devices recovered in relation to the present investigation.

---

[15] After sealing the premises and securing the scene, CMPD allowed Michael SIMMONS to enter the residence to retrieve some items he said he needed "for work." Included in the items CMPD allowed Simmons to take from the premises were two firearms.

11

27. I respectively request a search warrant be issued to search the person of **Marcus Edward PINSON III**, date of birth: 09/05/1992, social security number XXX-XX-0223, for the purpose of obtaining deoxyribonucleic acid (DNA) and major case fingerprints (to include palm prints) to compare with any fingerprints or DNA that are found on the materials consistent with constructing explosive devices mentioned above.

Respectfully submitted,

**S/Theresa Wellens**

Theresa Wellens
Special Agent
Federal Bureau of Investigation

In accordance with Rule 4.1(b)(2)(A), the Affiant attested under oath to the contents of this Affidavit, which was submitted to me by reliable electronic means, on this 4th day of April, 2022 at 3:49 PM.

Signed: April 4, 2022

W. Carleton Metcalf
United States Magistrate Judge

12

## ATTACHMENT A

From the person of **Marcus Edward PINSON III**, date of birth: 09/05/1992, social security number XXX-XX-0223, including the inside of his mouth and his hands and fingers.

## ATTACHMENT B

1. Deoxyribonucleic Acid (DNA) Sample (in the form of buccal swabs taken from inside the mouth/cheek of **Marcus Edward PINSON III)** and

2. Major Case Fingerprints, namely impressions of the entirety of both of **Marcus Edward PINSON III**'s hands including prints of his palms and fingers.